**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| In re:<br><br>        PRO SOUTH, INC.,<br><br>Debtor. | Case No. 19-42427-BTR<br>Chapter 11 |

<u>**MOTION TO CONVERT CASE TO CHAPTER 7**</u>

<u>**14-DAY NEGATIVE NOTICE – LBR 1017(d):**</u>

**Your rights may be affected by the relief sought in this pleading. You should read this pleading carefully and discuss it with your attorney, if you have one in this bankruptcy case. If you oppose the relief sought by this pleading, you must file a written objection, explaining the factual and/or legal basis for opposing the relief.**

**No hearing will be conducted on this Motion unless a written objection is filed with the Clerk of the United States Bankruptcy Court and served upon the party filing this pleading WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE shown in the certificate of service unless the Court shortens or extends the time for filing such objection. If no objection is timely served and filed, this pleading shall be deemed to be unopposed, and the Court may enter an order granting the relief sought. If an objection is filed and served in a timely manner, the Court will thereafter set a hearing with appropriate notice. If you fail to appear at the hearing, your objection may be stricken. The Court reserves the right to set a hearing on any matter.**

**COMES NOW** Regions Bank ("Regions"), by and through undersigned counsel, and pursuant to 11 U.S.C. § 1112(b), respectfully moves (this "Motion") for an order converting the above-captioned bankruptcy case (the "Case") to Chapter 7. In support thereof, Regions states as follows:

<u>**INTRODUCTION**</u>

As a threshold matter, this Motion should be considered by the Court in tandem with the

*Motion of Regions Bank to Retroactively Annul the Automatic Stay as to Certain Real Property Sold*

*at Foreclosure Sale on March 5, 2020* [Dkt. No. 10] (the " Stay Annulment Motion"), filed in *In re Russell Stites, Case No. 20-40703,* also pending in this Court. A copy of the Stay Annulment Motion is attached hereto as **Exhibit 1**.

Pro South, Inc. (the "Debtor" or "Pro South") filed a petition for relief under Chapter 11 of the Bankruptcy Code over six months ago on September 4, the day before a scheduled September 5, 2019 foreclosure sale of certain real property owned by Pro South, Inc. Russell  M. Stites ("RMS") is the 100% shareholder of Pro South.  Since filing its petition, the Pro South has merely parked itself in the bankruptcy court for the past six months to buy time while it has delayed Regions lawful attempts to foreclose Pro South's interest in the Real Property Collateral.[1] Pro South has made no effort to reorganize and has demonstrated no intention to reorganize. Now that Regions has foreclosed on the Real Property Collateral, Pro South lacks any business prospects, and maintaining the Case in Chapter 11 is a waste of the Court's resources, as well as those of Pro South's creditors.

Abundant cause exists for the Court to immediately convert this case to Chapter 7. Regions requests that the Court convert this case to allow the appointment of a Chapter 7 trustee to liquidate any unencumbered estate assets, including causes of action, and, to investigate the acts, omissions and transactions of Pro South's shareholders and officers, both prior to and during the pendency of the Chapter 11.

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. § 1334(b) and the standing order of reference of the District Court. This matter is a core proceeding. 28 U.S.C. §§ 157(b)(1), (b)(2)(A).

---

[1] This property is defined as the Real Property Collateral, and more particularly described in the *Stay Annulment Motion* [Dkt. No. 10] . When used herein, "Real Property Collateral," shall have the same meaning as set forth in the Stay Annulment Motion.

2.      Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

<div align="center">

**FACTUAL BACKGROUND**

</div>

3.      Most of the factual allegations set forth below are also set out in the Factual

Background of the Stay Annulment Motion.  Specifically, sections A – G below are identical to the

Factual Allegations in the Stay Annulment Motion.

4.      Prior to June 20, 2018, RMS controlled and owned 100% of three affiliated

companies operating in and around Booneville, Mississippi: (1) Pro South, Inc. ("Pro South"); (2)

Pro Logging, Inc. ("Pro Logging"); and Pro Trucking, Inc. ("Pro Trucking"). Together, these

companies operated a logging, trucking, and saw mill business in Booneville, Mississippi.

A.      **REGIONS EXTENDS LOANS TO PRO SOUTH, PRO LOGGING, AND PRO TRUCKING.**

5.      To fund the operations of the businesses, these companies became obligated to

Regions on a number of debt instruments, including the following:

a.      A term loan through which Pro South is indebted to Regions in the stated principal
        amount of $242,992.75 ("Loan 1"), which loan matured on July 23, 2018;

b.      A term loan through which Pro South is indebted to Regions in the stated principal
        amount of $149,951.75 ("Loan 2"), which loan matured on March 18, 2018;

c.      A term loan through which Pro South is indebted to Regions in the stated principal
        amount of $194,297.40 ("Loan 3"), which loan matured on January 31, 2018;

d.      A term loan through which Pro South is indebted to Regions in the stated principal
        amount of $418,292.25 ("Loan 4"), which loan matured on December 1, 2017;

e.      A working capital line of credit loan through which Pro South, Pro Logging, and Pro
        Trucking (this combination is sometimes referred to herein collectively as the
        "Borrowers") are indebted to Regions in the stated principal amount of $1,520,300.00

("Loan 5"), which loan, absent certain defaults that have occurred, would have matured on November 3, 2026; and

f.       A term loan through which the Borrowers are further indebted to Regions in the stated principal amount of $3,202,000.00 (individually, "Loan 6," and together with Loan 1 – Loan 5, the "Loans"), which loan, absent certain defaults that have occurred, would have matured on November 3, 2036.

*See* Affidavit of Robert Smith, at ¶ 6.[2]

6.       Loan 5 is further evidenced and secured by (i) that certain Note dated November 3, 2016 from Borrowers in favor of Regions (as previously or hereafter amended, the "Loan 5 Note"); (ii) that certain Loan Agreement dated November 3, 2016 by and between Borrowers and Regions (the "Loan 5 Loan Agreement"); (iii) that certain Credit Agreement dated November 3, 2016 by and among Borrowers and Regions (the "Loan 5 Credit Agreement"); (iv) that certain Security Agreement –SBA dated November 3, 2016 from Borrowers and the Debtor in favor of Regions (the "Loan 5 Security Agreement 1"); (v) that certain Security Agreement dated November 3, 2016 from Borrowers in favor of Regions (the "Loan 5 Security Agreement 2"); (vi) that certain Unconditional Guaranty dated November 3, 2016 from the Debtor in favor of Regions (the "RMS Loan 1 Guaranty"); (vii) that certain Unconditional Limited Guarantee dated November 3, 2016 from Amy Glissen Stites ("AGS" and together with RMS and the Borrowers, the "Obligors") in favor of Regions (the "AGS Loan 5 Guaranty"); and (viii) that certain Deed of Trust from Obligors for the benefit of Regions, as recorded November 7, 2016 as Instrument No. 2016004530 with the Prentiss County, Mississippi Chancery Court (the "Loan 5 Deed of Trust"). The Obligors pledged certain real property to Regions as collateral for Loan 5 pursuant to the Loan 5 Deed of Trust, and that real

---

[2] The Smith Affidavit is submitted herewith as **Exhibit 1-A** to **Exhibit 1**.

property collateral is referred to herein as the "Loan 5 Real Property Collateral." *See* Affidavit of Robert Smith, at ¶ 7. Copies of the Loan 5 Note, Loan 5 Loan Agreement, Loan 5 Credit Agreement, Loan 5 Security Agreement 1, Loan 5 Security Agreement 2, RMS Loan 1 Guaranty, AGS Loan 5 Guaranty, and the Loan 5 Deed of Trust are attached to the Smith Affidavit, as **Exhibits A–H**.

7.      Loan 6 is further evidenced and secured by (i) that certain Note dated November 3, 2016 from Borrowers in favor of Regions (as previously or hereafter amended, "the Loan 6 Note"); (ii) that certain Loan Agreement dated November 3, 2016 by and between Borrowers and Regions (the "Loan 6 Loan Agreement"); (iii) that certain Credit Agreement dated November 3, 2016 by and among Borrowers and Regions (the "Loan 6 Credit Agreement"); (vi) that certain Security Agreement – SBA dated November 3, 2016 from Borrowers and RMS in favor of Regions (the "Loan 6 Security Agreement 1"); (v) that certain Security Agreement dated November 3, 2016 from Borrowers in favor of Regions (the "Loan 6 Security Agreement 2"); (vi) that certain Unconditional Guaranty dated November 3, 2016 from RMS in favor of Regions (the "RMS Loan 6 Guaranty"); (vii) that certain Unconditional Limited Guarantee dated November 3, 2016 from AGS in favor of Regions (the "AGS Loan 6 Guaranty"); and (viii) that certain Deed of Trust from Obligors for the benefit of Regions, as recorded November 7, 2016 as Instrument No. 2016004529 with the Prentiss County, Mississippi Chancery Court (the "Loan 6 Deed of Trust"). *See* Affidavit of Robert Smith, at ¶ 8. Copies of the Loan 6 Note, Loan 6 Loan Agreement, Loan 6 Credit Agreement, Loan 6 Security Agreement 1, Loan 6 Security Agreement 2, RMS Loan 6 Guaranty, AGS Loan 6 Guaranty, and the Loan 6 Deed of Trust are attached as **Exhibits I–P** to the Smith Affidavit. The Obligors pledged certain real property to Regions as collateral for Loan 6 pursuant to the Loan 6 Deed of Trust, and

that real property is referred to herein as the "Loan 6 Real Property Collateral."[3] *See* Affidavit of Robert Smith, at ¶ 8. The Real Property Collateral is identically described in the Loan 5 Deed of Trust and the Loan 6 Deed of Trust, and consists of multiple parcels of real property in Prentiss County, MS. The various parcels of the Real Property Collateral are owned by Pro South, in its sole corporate capacity; Pro Logging, in its sole corporate capacity; RMS, in his sole individual capacity; Amy Glisson Stites ("AGS"), in her sole individual capacity; and RMS and AGS as Joint Tenants with Right of Survivorship. *See* Affidavit of Robert Smith, at ¶ 8. One of the parcels that is jointly owned by RMS and AGS, as Joint Tenants with Right of Survivorship, is an approximately 10-acre parcel, containing a single family home that, upon information and belief, and according the Bankruptcy Petition, is the primary residence of RMS, and has an address of 149 CR 1000, Booneville, MS, 38829 (the "Residence").[4]

### B.   REGIONS DECLARED EVENTS OF DEFAULT ON THE LOANS IN EARLY 2018

8.   The Obligors failed to satisfy their obligations with respect to the Loans pursuant to the terms and conditions of the documents evidencing and securing the Loans (collectively, the "Loan Documents"), and on February 1, 2018, Regions issued a formal written demand that the Loans be paid in full on or before February 8, 2018. *See* Affidavit of Robert Smith, at ¶ 9.

9.   The Obligors failed to pay the Loans in full on or before February 8, 2018, and Regions implemented foreclosure procedures (the "First Foreclosure Proceedings") to foreclose on the Real Property Collateral, all of which is wholly located within Prentiss County, Mississippi.

---

[3] The Loan 5 Real Property Collateral and the Loan 6 Real Property Collateral are described herein as the "Real Property Collateral."

[4] This Motion relates only to Loan 5, Loan 6, and the Real Property Collateral, which secures those loans.

Regions scheduled the First Foreclosure Proceedings for June 5, 2018. *See* Affidavit of Robert Smith, at ¶ 10.

10.     At the request of RMS, Regions cancelled the First Foreclosure Proceedings in consideration of the Obligors entering into that certain Forbearance and Modification Agreement dated effective as of June 4, 2018 (as amended from time to time, the "Forbearance Agreement"). *See* Affidavit of Robert Smith, at ¶ 11.

**C.     RMS AND HIS COMPANIES BEGIN ENGAGING IN A BAD FAITH BANKRUPTCY SCHEME EFFECTING MULTIPLE BANKRUPTCIES TO DELAY REGIONS FROM EXERCISING ITS LAWFUL RIGHT TO FORECLOSE OBLIGORS' INTERESTS IN THE REAL PROPERTY, AND TO PREVENT OTHER CREDITORS FROM REPOSSESSING EQUIPMENT OWNED BY PRO LOGGING AND PRO TRUCKING.**

11.     Between June 20, 2018 and March 5, 2020, Russell Stites coordinated and authorized six (6) separate bankruptcy filings, all designed to delay Regions from foreclosing the Obligors' interest in the Real Property Collateral, or, in the case of the first two bankrupticies, to forestall another secured creditor from repossessing logging and trucking equipment in which it had a security interest that was senior to that held by Regions. *See* Affidavit of Robert Smith, at ¶ 12.

**a.     Pro Logging and Pro Trucking File Bankruptcy, Delaying the Repossession of their Equipment.**

12.     On June 20, 2018, Pro Logging filed under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in the Northern District of Mississippi (the "Mississippi Bankruptcy Court"), Case No. 18-12388-SDM, (the "Pro Logging Bankruptcy"). *See* Affidavit of Robert Smith, at ¶ 13.

13.     Shortly thereafter, on June 22, 2018, Pro Trucking filed under Chapter 11 of the Bankruptcy Code in the Mississippi Bankruptcy Court, Case No. 18-12428-SDM ("Pro Trucking Bankruptcy"). *See* Affidavit of Robert Smith, at ¶ 14.

14.     The Pro Logging Bankruptcy and the Pro Trucking Bankruptcy were filed to prevent another Creditor, Commercial Credit Group ("CCG") from repossessing the majority of their logging and trucking equipment.  Pro Logging and Pro Trucking ultimately violated the adequate protection provisions granted to CCG by the Court, and CCG repossessed and liquidated all of its collateral, consisting primarily of logging equipment and trucks used by Pro Logging and Pro Trucking to conduct their businesses.

15.     During these bankruptcies, and at the Obligors' request, Regions modified the Forbearance Agreement and other Loan Documents pursuant to that certain Amendment to Forbearance and Modification Agreement dated October 19, 2018 to, *inter alia*, extend the maturity of the Loans (the "First Forbearance Amendment"). *See* Affidavit of Robert Smith, at ¶ 16.

16.     Unable to satisfy the terms and conditions set forth in the Forbearance Agreement, as modified by the First Forbearance Amendment, at the Obligors' request, Regions further modified the Forbearance Agreement and other Loan Documents pursuant to that certain Second Amendment to Forbearance and Modification Agreement dated November 5, 2018 (the "Second Forbearance Amendment"). *See* Affidavit of Robert Smith, at ¶ 17.

17.     The Obligors again failed to satisfy the terms and conditions of the Forbearance Agreement, as modified by the Second Forbearance Amendment, and on November 28, 2018, Regions issued a written demand to Pro South, RMS, and AGS for payment in full of the Loans on or before December 8, 2018. *See* Affidavit of Robert Smith, at ¶ 18.

18.     Pro South, RMS and AGS failed to pay the Loans in full on or before December 8, 2018. *See* Affidavit of Robert Smith, at ¶ 19.

19.     After filing various motions (including a motion for stay relief) in the Pro Logging Bankruptcy, attending hearings with witnesses, and incurring significant fees and expenses, Regions

obtained an order from the Mississippi Bankruptcy Court granting Regions relief from the automatic

stay in the Pro Logging Bankruptcy to foreclose on its collateral, which included, without limitation,

the Real Property Collateral. *See Order on Motion for Relief from the Automatic Stay*, *In re Pro

Logging, Inc.*,18-12388-SDM [Dkt. No. 174]; Affidavit of Robert Smith, at ¶ 20.

20.     The Pro Logging Case and the Pro Trucking Case were subsequently converted to

cases under Chapter 7. *See Order Granting Motion to Convert Case to Chapter 7*, *In re Pro Logging,

Inc.*, No. 18-12388-SDM [Dkt. No. 156]; *Order Granting Motion to Convert Case to Chapter 7*, *In

re Pro Trucking, Inc.*, No. 18-12428-SDM [Dkt. No. 103]. On April 5, 2019, the Interim Chapter 7

Trustee in both cases, Jeffery Levingston filed Reports of No Assets, and abandoned all of the assets

in those cases.[5] The Mississippi Bankruptcy Court subsequently issued orders closing those cases.

*See Final Decree / Order Closing Case*, *In re Pro Logging, Inc.*, No. 18-12388-SDM [Dkt. No. 195];

*Final Decree / Order Closing Case*, *In re Pro Trucking, Inc.*, No. 18-12428-SDM [Dkt. No. 114].

21.     After obtaining stay relief in the Pro Logging Bankruptcy and the Pro Trucking

Bankruptcy, Regions rescheduled, and republished, the foreclosure sale of the Real Property

Collateral for June 25, 2019 (the "Second Foreclosure Proceeding"). *See* Affidavit of Robert Smith,

at ¶ 21.

### b. Pro South and RMS File Bankruptcy in Mississippi, Delaying the Second Foreclosure Proceeding

22.     The day before the June 25, 2019 foreclosure sale, Pro South filed for Chapter 7

protection in Northern District of Mississippi, delaying the scheduled foreclosure sale for a second

time, Case No. 19-12549-SDM (the "First Pro South Bankruptcy"). *See* Affidavit of Robert Smith,

---

[5] This entry is a text-only entry made on the docket of the Pro Logging Bankruptcy and the Pro Trucking
Bankruptcy.

at ¶ 22. The same day, RMS also filed a bankruptcy petition under Chapter 7 of the Bankruptcy Code in the Mississippi Bankruptcy Court, Case No. 19-12552-SDM (the "First RMS Bankruptcy"). *Id.*

23.      Neither Pro South, nor RMS, actually prosecuted their Bankruptcy cases, and, just one month after Pro South and RMS filed their Chapter 7 bankruptcy proceedings in Mississippi, the Bankruptcy Court there dismissed both bankruptcy cases on July 24, 2019 for failure to timely file schedules and financial disclosures statements or to pay the required bankruptcy fees. *See Order of Dismissal for Failure to Timely File Documents or to Pay Required Fees*, Case No. 19-12552-SDM [Dkt. No. 21] (the "First RMS Bankruptcy Order of Dismissal"); *Order of Dismissal for Failure to Timely File Documents or to Pay Required Fees*, Case No. 19-12549-SDM [Dkt. No. 19] (the "First Pro South Bankruptcy Order of Dismissal"); Affidavit of Robert Smith, at ¶ 23. Thus, all these bankruptcies accomplished was to succeed in delaying the Second Foreclosure Proceeding.

### c. Pro South Files Second Bankruptcy in Texas, Delaying the Third Foreclosure Proceeding

24.      After the Mississippi Bankruptcy Court dismissed the First RMS Bankruptcy and the First Pro South Bankruptcy, Regions again issued foreclosure notices to interested parties and published foreclosure notices for a rescheduled September 4, 2019 foreclosure sale (the "Third Foreclosure Proceeding"). *See* Affidavit of Robert Smith, at ¶ 24.

25.      The morning of the scheduled September 4, 2019 foreclosure sale, Pro South filed a Chapter 11 Petition in this Court, delaying the foreclosure sale for yet a *third* time, Case No. 19-42427, and its counsel notified counsel for Regions while en route from Birmingham, AL to Booneville, MS to conduct the sale (the "Second Pro South Bankruptcy"). *See* Affidavit of Robert Smith, at ¶ 25**.**

### D.    PRO SOUTH ENTERS INTO AND QUICKLY BREACHES SETTLEMENT AGREEMENT

26.    Following the Second Pro South Bankruptcy, Regions filed the *Motion by Regions Bank to Transfer Venue of Bankruptcy Case* [Dkt No. 11] (the "Venue Motion"), arguing that this Court was an improper venue for the Second Pro South Bankruptcy, as all of Pro South's assets and operations were located in Booneville, Mississippi.  After a hearing in which Mr. Roderick Kagy, the newly appointed CEO of Pro South testified that he had taken over all of the financial operations of Pro South, and that he resided in this judicial district, the Court denied the Venue Motion, without prejudice to Regions to right to refile it if subsequent evidence was developed to show that venue in this district was indeed improper.  *See Order Denying Motion to Transfer Case to Another District* [Dkt. No. 36] (the "Venue Order"). At that point, Regions and Pro South, entered into negotiations surrounding a settlement agreement to give Pro South time to secure financing to replace Loans 5 and 6.  Those negotiations were subsequently expanded to include RMS, AGS, Pro Logging, and Pro Trucking. *See* Affidavit of Robert Smith, at ¶ 26. As a result of those negotiations, Regions, Pro South, Pro Trucking, Pro Loggins, RMS, and AGS, entered into a settlement agreement dated October 31, 2019 (the "Settlement Agreement"),[6] which included certain concessions to Pro South, and which inured to the benefit of  Pro Logging, Pro Trucking, RMS and AGS. *See* Affidavit of Robert Smith, at ¶ 26.

27.    Under the Settlement Agreement, the Obligors would receive, without limitation, a complete release, and Regions was supposed to receive the following payments:[7]

---

[6] On December 10, 2019, this Court entered its *Order Approving Debtor's Settlement with Regions Bank Pursuant to Fed. R. Bankr. P. 9019 and 4001(d)* [Dkt. No. 61] (the "Settlement Order").

[7] This paragraph only sets out the payment terms owed Regions by the Obligors under the Settlement Agreement. The Settlement Agreement imposes a bevy of other additional terms on the Obligors—however, given the Obligors' failure to meet the payment terms, the Obligors' failure or success in meeting any of the non-payment terms need not be discussed.

$20,000 (the "Initial Adequate Protection Payment");

$22,500 on or before each of November 30, 2019, December 31, 2019, and January 25, 2019 (collectively, the "Additional Adequate Protection Payments" together with the Initial Adequate Protection Payment, collectively, the "Adequate Protection Payments"); and

$4,350,000 (the "Total Settlement Amount") on or before January 31, 2020 (the "Initial Settlement Payment Date").

The Obligors could extend the deadline for the Total Settlement Agreement for two 30-day periods upon the payment of a $50,000 extension fee.

*See* Affidavit of Robert Smith, at ¶ 27.

28.     The Obligors failed to timely deliver the required Additional Adequate Protection Payments, as this Court is aware. *See* Transcript of January 21, 2020 Hearing in Pro South Case, at 02:11–12 ("The debtor is a bit behind on its adequate protection payments."); Affidavit of Robert Smith, at ¶ 28. Notwithstanding the payment defaults, Regions agreed to provide the Obligors additional time to deliver the Additional Adequate Protection Payments. *See id.*, at 2:12–14 ("But [Regions has] agreed to give the debtor some time to continue to operate and work on catching up adequate protection payments."); Affidavit of Robert Smith, at ¶ 28.

29.     With respect to the Total Settlement Amount, the Obligors are dependent on receiving take-out financing to make this payment. *See* Transcript of February 4, 2020 Hearing (hereinafter, "Feb. 4th Hearing Tr, at _____"), at 6:17–21 ("Did the debtor enter into a settlement agreement with Regions Bank that provided for a reduce[d] payoff, in exchange for some take-out financing that the debtor would obtain? Yes."). The Obligors have also failed, and continue to fail, to timely deliver the Total Settlement Amount. *See id.*, at 06:22–24 ("[A]s of January 2nd of this year, had the debtor formalized its take-out financing? No.").

30.     Between entry of the Settlement Order and February 6, 2020, the Obligors had committed numerous defaults under the Settlement Agreement, including: (1) failure to timely

deliver the complete adequate protection payments due for, November 2019, December 2019, and January 2020;[8] (2) failure to pay 2019 ad valorem taxes; and (3) failure to deliver the Total Settlement Amount. On or around February 3, 2020, Regions gave the Obligors notice of, without limitation, the aforementioned defaults that the Obligors had committed in violation of the Settlement Agreement. *See* Affidavit of Robert Smith, at ¶ 28.

31.     Upon entry of the Settlement Order, Regions was granted immediate stay relief upon the occurrence of any Events of Default (defined therein), which included the "failure by any Obligor under this Agreement to observe or perform any term, condition, covenant, or agreement set forth herein[.]" Settlement Agreement, at 6 ¶ 5(a); *see* Affidavit of Robert Smith, at ¶ 29. The aforementioned defaults, *see supra*, at ¶ 30, constitute Events of Default. *See* Affidavit of Robert Smith,. at ¶ 29.

32.     On February 6, 2020, Regions provided additional notice of default, demand, acceleration, and also rescheduled, and republished, the foreclosure sale of the Real Property Collateral for March 5, 2020 (the "Fourth Foreclosure Proceeding"). *See* Affidavit of Robert Smith, at ¶ 30.

33.     At a subsequent hearing held on February 18, 2020, counsel for Pro South and Regions advised the Court that Pro South's defaults under the Settlement Agreement continued to exist, and that Regions had scheduled another Foreclosure Sale for March 5, 2020, as discussed below.

---

[8] The Obligors have only made a single complete adequate protection payment—the Initial Adequate Protection Payment, and it was not paid until November 25, 2019. With respect to the adequate protection payment due in November of 2019, the Obligors paid $10,000.00 on December 12, 2019, and have failed to pay the remaining $12,500.00 owed with respect to that payment.

### E.     THE DEBTOR HOLDS INSURANCE PROCEEDS HOSTAGE IN VIOLATION OF THE CREDIT AGREEMENT.

34.     Sometime in January, a tornado, or similar severe weather event, ran through Booneville, MS causing substantial damage to the Real Property Collateral (the "Event of Loss"). Despite this damage, Regions would not learn of the effect this natural disaster had on the Real Property Collateral until Rod Kagy testified about the subject in February, stating

> We had our scale house go down with high winds. It wasn't necessarily a tornado, but it was a high wind event. And, I mean, a mini tornado, which knocked the scale house out of operations for a week.

Feb. 4th Hearing Tr, at 7:19–22. Not only did the Obligors fail to provide Regions notice that a tornado had inflicted substantial damage to the Real Property Collateral, the Obligors further failed to provide Regions notice that they had: (1) made a claim to their insurance provider, Seneca Insurance (the "Insurer"), the day after the damage was sustained; and (2) received a $25,000 check from the insurer, with the expectation that they would receive an additional check for $175,000 (together, with the $25,000 check, the "Insurance Proceeds") in short order as an advance on the total distribution on their claim. *See* Affidavit of Robert Smith, at ¶ 31. Regions would not learn of these facts until Rod Kagy disclosed to Regions counsel after it investigated the matter further. *See* Affidavit of Robert Smith, at ¶ 31.

35.     All of the Obligors' actions in the prior paragraph are defaults under the Loan Documents. *See* Affidavit of Robert Smith, at ¶ 32. Pursuant to the terms of the Deeds of Trust, the Obligors were required to promptly notify Regions of any Event of Loss, which event included a tornado tearing through the Real Property Collateral. *See id*. The Obligors failed to do that, *id*., instead attempting to retain the Insurance Proceeds and use them at their discretion.

36.     Once Regions learned that the Debtor committed the numerous Loan Document violations described above, Regions' counsel contacted the Insurer, and Renesant Insurance, Inc,

agent for the Insurer, to inquire about the Insurance Proceeds. *See* Affidavit of Robert Smith, at ¶ 33.

During these conversations, it was discovered, to the complete and utter astonishment of Regions, that that Pro South allowed the hazard insurance policy to be cancelled by the premium finance company, for non-payment of the monthly premiums due under the premium finance agreement, and that RMS had been made fully aware of the impending cancellation through multiple notifications that the policy would be cancelled absent payment. *Id.* Given both the claim made on the Real Property Collateral, and the cancellation of the hazard insurance policy due to non-payment, Regions is informed that the Insurer will not reinstate the policy. *Id.* Accordingly, and perhaps most importantly to this Court's determination of this Motion, the Real Property Collateral is completely uninsured at present. *Id.*

37.     Additionally, RMS is presumably in possession of two checks issued by the Insurer, totaling $200,000 and has refused to turn over the proceeds, despite Regions' multiple demands that the Debtor turnover the Insurance Proceeds—such demands being made by letter and e-mail on February 28, 2020 (letter), February 28, 2020 (e-mail), March 4, 2020 (e-mail), March 5, 2020 (e-mail), and March 11, 2020 (e-mail). *See* Affidavit of Robert Smith, at ¶ 34.

38.     Thus far, Regions demands for the Insurance Checks have been ignored, and or refused.  It is believed that the Checks remain in the possession of RMS, as they were mailed to the Booneville, MS office of Pro South.  However, neither RMS, Pro South, nor their counsel have informed Regions as to who currently has possession of the Insurance Checks, or whether they have been negotiated.

## F.     RMS FILES BANKRUPTCY, SEEKING TO DELAY THE FOURTH FORECLOSURE PROCEEDING.

39.     The morning of March 5, 2020, Joe A. Joseph ("Mr. Joseph"), counsel for Regions, and Robert L. Smith, Jr., an officer of Regions Bank and its affiliate, LMIW VII, LLC, travelled

from Birmingham to Booneville, Mississippi to conduct the Fourth Foreclosure Proceeding at the

Prentiss County, Mississippi Courthouse. *See* Affidavit of Robert Smith, at ¶ 36**;** Affidavit of Joe

Joseph, at ¶ 1. A copy of the Affidavit of Joe Joseph is attached hereto as **Exhibit 3-A** to **Exhibit 1**.

Expecting that RMS and\or AGS might yet again try to delay the foreclosure sale through a

bankruptcy filing, on the day prior to the sale, as well as the day of the sale, Mr. Joseph instructed

his paralegal, Michael Carl Ivey ("Mr. Ivey") to regularly check the online PACER database to see

if RMS, or AGS, had filed bankruptcy the night of March 4, 2020, or the morning of March 5, 2020,

even though neither RMS or AGS, or anyone representing them had advised Mr. Joseph that such a

filing was forthcoming. Mr. Ivey checked PACER periodically on March 4, and on the hour,

beginning at approximately 8:00 AM on March 5, and one last time at approximately 11:30 AM. *See*

Affidavit of Joe Joseph, at ¶ 4. With no bankruptcy filings having been discovered in Mississippi,

where RMS and AGS reside, Mr. Joseph commenced the Fourth Foreclosure Proceeding at

approximately 11:30 AM, and concluded it at approximately 12:10 PM. *See* Affidavit of Joe Joseph,

at ¶ 4. LMIW VII, LLC, an Alabama limited liability company affiliated with Regions, was the only

bidder at the sale, and purchased the Real Property Collateral with highest and best bid in the amount

of $2,057,834.00 (the "Foreclosure Sale"). *See* Affidavit of Joe Joseph, at ¶ 5. The Substitute

Trustee's Deed (the "Substitute Deed") was recorded in the Chancery Court of Prentiss County,

Mississippi at 12:59 PM, when the recording clerk returned from her lunch break.  A copy of the

Substitute Deed is attached as **Exhibit A** to the Affidavit of Joe Joseph.

40.     Unbeknownst to Mr. Joseph, his associates, his Texas co-counsel in the Pro South

case, or any officers of Regions, at approximately 11:15AM on March 5, 2020, RMS filed the present

Chapter 13 bankruptcy proceeding in this Court (the "Second RMS Bankruptcy"). Counsel for RMS

failed to call Mr. Joseph, his associates, his Texas co-counsel, or Regions, to advise that the Debtor

had filed the instant case. Instead, Counsel for RMS, Mr. Robert Newark, e-mailed Mr. Joseph at

approximately 11:19AM, on March 5, 2020, according to the time-stamp on the e-mail writing:

> Joe:
>
> Attached to this email, please find notice of bankruptcy filing for my
> client, Russell Stiles[SIC]. Please stop any foreclosures sale from
> occurring today.
>
> Contact me directly if you have any questions.

This e-mail was automatically flagged as spam by Burr & Forman's e-mail server, and was not

delivered directly to Mr. Joseph's inbox until approximately 1:15 PM, according to the time stamp

on the spam e-mail notification. Mr. Joseph only became aware of Mr. Newark's e-mail at

approximately 5:45 PM, upon his return to Birmingham from Booneville, and his review of his spam

report.

### G. RMS INCLUDES PATENTLY FALSE INFORMATION IN HIS PETITION FOR RELIEF

41.     In his Bankruptcy Petition, RMS indicates that "[o]ver the last 180 days before filing

this petition, I have lived in this district longer than in any other district." Bankruptcy Petition, *Relief*,

at 2 [Dkt. No. 1]. On the same page, RMS states his address as 149 [County Road] 1000, Booneville,

MS 38829 (the "RMS's Address"). *Id.*   RMS's Address refers to his residence located on the

combination of parcels forming the Real Property Collateral. RMS's Address is not located in the

Eastern District of Texas, but rather in Booneville, MS.

42.     Additionally, RMS indicates that he estimates his liabilities to be $100,001–

$500,000. *Id.*, at 6. To the contrary, solely with respect to the indebtedness owed to Regions on

account of the RMS Guaranties of Loans 1-6, the Debtor is indebted to Regions in an amount in

excess of $6,231,345.57. *See* Regions Proof of Claim 5-1, *In re Pro South*, Case No. 19-42427.

#### H.    OPERATING REPORTS & UNEXPLAINED CASH INFUSIONS

43.    Pro South has filed Operating Reports for the months of September, October, November, December, and January.[9] Pro South failed to file operating reports for February. The operating reports show a severely cash strained business. In September, November, and January, Pro South reported a negative cash flow in its operating reports. *See Operating Report*, at 2 [Dkt. No. 78] (reporting a cash flow of [$7,809.82] for September, [$6,330.86] for November); *Operating Report*, at 2 [Dkt. No. 91] (reporting a cash flow of [$12,748.58] for January).

44.    In December, Pro South reported a net cash flow of $11,213.99. *See Operating Report*, at 2 [Dkt. No. 91]. However, during the month of December, and with no explanation as to the source of funds, Pro South received $57,852.80 of gross cash infusions from RMS.[10] *See Operating Report*, at 11, 13 [Dkt. No. 78].

45.    During the month of January, and again with no explanation as to the source of funds, Pro South received $31,000.00 of gross cash infusions from RMS. *See Operating Report*, at 11 [Dkt. No. 91]. Unlike in December, in January the Debtor reported a cash flow of ($12,748.58), despite these cash infusions.

#### I.    PAYMENTS TO CEO RODERICK KAGY, WHILE FAILING TO PAY INSURANCE PREMIUM.

46.    The premium due the Insurer under Pro South's insurance policy covering the Real Property Collateral was $12,090.00, which covered the 1-year policy period of October 2019 through October 2020. Pro South financed this premium with IPFS Corporation of the South (the "Premium

---

[9] On January 2, 2020, Pro South filed what appears to be an amended Operating Report for the month of October. *See* Dkt. No. 69. The only change appears to be the addition of bank statements omitted from the original October Operating Report. *See* Dkt. No. 60.

[10] During the same period, Pro South also paid RMS $10,000.00 without explanation. *See Operating Report*, at 13 [Dkt. No. 78].

Finance Company"). Payments were due on the 14th of each month, and Pro South made the first

two payments due in November and December. However, Pro South failed to make the $1,164.66

payment that was due January 14, 2020 (the "January 14th Payment"). On January 20, 2020, the

Premium Finance Company mailed notice (the "January 20th Notice") to Pro South stating that the

January 14th Payment was late. A copy of the January 20th Notice is attached hereto as **Exhibit 2**.

Pro South failed to make the January 14th Payment after receiving the January 20th Notice, and the

Premium Finance Company, pursuant to the power of attorney granted to it under the Premium

Finance Agreement, cancelled the policy for non-payment. The Premium Finance Company

provided notice of cancellation by mail on February 10, 2020 (the "February 10th Notice"). A copy

of the February 10th Notice is attached hereto as **Exhibit 3**.

47.    Instead of paying the January 14th Payment, which would have kept the policy from

being cancelled, Pro South wrote a check on January 9, 2020, paying Rod Kagy $5,000.00, to wit—



*Operating Report*, at 15 [Dkt. No. 91].

### ARGUMENT

#### I.  CAUSE EXISTS TO SUPPORT A CONVERSION ORDER

48.  Bankruptcy Code 11 U.S.C. § 1112(b) provides, in pertinent part, as follows:

[O]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter [11 USC §§ 1101 et seq.] to a case under chapter 7 [11 USC §§ 701 et seq.] or dismiss a case under this chapter [11 USC §§ 1101 et seq.], whichever is in the best interests of creditors and the estate, if the movant establishes cause.

The statute goes on to define "cause" to include the following:

(A)  Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

. . .

(C)  Failure to maintain appropriate insurance that poses a risk to the estate or to the public;

. . .

(F)  Unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter[.]

11 U.S.C. § 1112(b)(4). In addition to the examples of cause enumerated in the Bankruptcy Code, the Court has discretion to consider other factors which may constitute "cause." *See In re Gonic Realty Trust*, 909 F.2d 624, 626 (1st Cir. 1990).

> **a.  Cause Exists Due to the Continuing Loss to the Estate and the Absence of a Reasonable Likelihood of Rehabilitation.**

49.  The "cause" required under 11 U.S.C. § 1112(b)(4)(A), exists where there is a "[s]ubstantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation[.]" The Section 1112(b)(4)(A) analysis contemplates a "two-fold" inquiry into whether the estate has decreased in value and if there is a reasonable likelihood of rehabilitation. *See In re Miller*, 496 B.R. 469, 479 (Bankr. E.D. Tenn. 2013).

50.    With respect to the first prong—substantial or continuing loss to or diminution of the estate—a continuing negative cash flow following the entry of the Order for Relief is sufficient to establish a "continuing loss." *See Matter of Union Cty. Wholesale Tobacco & Candy Co., Inc.*, 8 B.R. 439, 441 (Bankr. D.N.J. 1981) ("[I]ndicia of the losses required to be shown under the standards of § 1112(b)(1) are noted in Collier on Bankruptcy as . . . 'a negative cash flow by the debtor after entry of the Order for Relief in the Chapter 11 case[.]'"); *In re Steak Loft of Oakdale, Inc.*, 10 B.R. 182, 185 (Bankr. E.D.N.Y. 1981) ("[A] negative cash-flow . . . may qualify as continuing losses[.]"); *see also In re Westgate Props., Ltd.*, 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010) (requiring proof that the debtor "continues to incur losses or maintains a negative cash-flow position after the entry of the order for relief."); *Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007) ("Negative cash flow and an inability to pay current expenses as they come due can satisfy the continuing loss or diminution of the estate standard for the purposes of § 1112(b)."). In September, November, and January, the Debtor reported a negative cash flow in its operating reports. *See Operating Report*, at 2 [Dkt. No. 78] (reporting a cash flow of [$7,809.82] for September, [$6,330.86] for November); *Operating Report*, at 2 [Dkt. No. 91] (reporting a cash flow of [$12,748.58] for January). Moreover, the Debtor has failed to file its Operating Report for February 2020, and will undoubtedly fail to file the March 2020 Operating Report. Importantly, during this time, the Debtor had the benefit of certain commercial property previously pledged to Regions, which the Debtor makes use of to accomplish its logging and trucking business. On March 5, 2020, Regions foreclosed on the Debtor's interest in the Real Property Collateral, and sold the Real Property Collateral to the highest bidder, LMIW VII, LLC, an affiliate of Regions. *See Stay Annulment Motion*, at ¶ 38. The import of this being that going forward, the Debtor will lose the ability to make use of the Real Property Collateral greatly exacerbating the

negative cash flow of the Debtor's business, with all other things being equal. Given the foregoing, the first prong of Section 1112(b)(4)(A) is met.

51.     The second requirement of Section 1112(b)(4)(A) is the absence of a reasonable likelihood of rehabilitation. Rehabilitation does not mean reorganization, which could involve liquidation. *In re TMT Procurement Corp.*, 534 B.R. 912, 920–21 (Bankr. S.D. Tex. 2015). Rather, "rehabilitation signifies something more, with it being described as 'to put back in good condition; re-establish on a firm, sound basis.'" 534 B.R. at 920 (quoting *In re V Cos.,* 274 B.R. 721, 726 (Bankr. N.D. Ohio 2002)). This analysis focuses less on the technical aspects of confirmation, but more on "whether the debtor's business prospects justify continuance of the reorganization effort." *In re LG Motors, Inc.,* 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009); *In re Basil St. Partners, LLC*, 477 B.R. 856, 862 (Bankr. M.D. Fla. 2012); *see In re Landmark Atl. Hess Farm, LLC*, 448 B.R. 707, 713 (Bankr. D. Md. 2011) ("[R]ehabilitation is not synonymous with reorganization and the determination is not whether a debtor can confirm a plan, but whether the debtor has sufficient business prospects."). Put simply, the Debtor has no business prospects.

52.     This Court previously provided for stay relief with respect to the Real Estate Collateral. *See generally Settlement Order*, at 2 ¶ 3 ("The automatic stay arising under 11 U.S.C. § 362 in this Bankruptcy Case is hereby immediately terminated to permit Regions to pursue any and all of its rights and remedies under the Loan Documents and applicable law with respect to the Loans and the Collateral."). This relief applied not only to Pro South, but also to RMS, as the Settlement Order provided that, "if any Obligor other than Pro South, Inc. files for relief under the Bankruptcy Code or is subject to any involuntary bankruptcy filings, such Obligor or Obligors shall consent to, and permit, Regions to obtain relief from the automatic stay." Settlement Order, at 3 ¶ d. Relying on this Order, Regions foreclosed on the Real Property Collateral. The Debtor

cannot operate its business absent the Real Property Collateral. Regions has not yet taken the steps to evict the Debtor from the Real Property Collateral, but this action is inevitable, and will occur in due time. Accordingly, the Debtor lacks business prospects, and will be unable to reorganize. As such "cause" under Section 1112(b)(4)(A) is present.

**b.  Cause Exists Given the Debtors' Failure to Maintain Appropriate Insurance.**

53.    A debtor's "[f]ailure to maintain appropriate insurance that poses a risk to the estate or to the public" also establishes "cause" under 11 U.S.C. § 1112(b)(4)(A). When a debtor owns real property with structures, Section 1112(b)(4)(C) requires that the debtor maintain property and liability insurance to protect the estate. *See Gilroy v. Ameriquest Mortgage Co., et al.* (*In re Gilroy*), No. NH 07– 054, 2008 WL 4531982 (1st Cir. BAP Aug. 4, 2008) (finding "cause" under 11 U.S.C. § 1112(b)(4)(A), where debtor failed to maintain property and liability insurance for five condominiums).

Similarly, in *In re Van Eck*, the court found that:

> The Debtor must maintain property and liability insurance coverage so that the assets of the bankruptcy estate are protected against loss. According to the Proof of Insurance, the Debtor does not have an insurance policy on the Essex Property and (except, perhaps, for Exterior Coverage) he has no insurance on the Branford Property that would protect the Debtor and his estate against casualty loss and/or liability claims for either property (e.g., a "trip and fall" on the Essex Property or third party property damage claims emanating from conditions inside the Branford Property). Insurance that so insures the Debtor and his estate is required under Section 1112(b)(4)(C). Failure to provide for such insurance coverage is Section 1112(b)(1) "cause" pursuant to Section 1112(b)(4)(C).

425 B.R. 54, 61 (Bankr. D. Conn. 2010). The Real Property Collateral has been damaged in the instant case, some portion of which houses an already dangerous sawmill. Thus, the potential for injury to the estate is great, and in the event of injury, the estate would be damaged without the being able to satisfy any corresponding liability from proceeds of an insurance policy. This risk is also

posed to the general public, as any injury would almost certainly not be capable of redress. Consequently, cause is established under Section 1112(b)(4)(C).

### c.  Cause Exists as the Debtor has Failed to timely File Operating Reports

54.     Pursuant to Section 704(8) of the Bankruptcy Code, made applicable by Sections 1107(a) and 1106(a)(1), and Fed. R. Bankr. P. 2015, the Debtor is required to file monthly operating reports with the Court no later than the twentieth day following the end of each calendar month. The Debtor has failed to file its monthly operating report for the month of February 2020, and has failed to timely file a single monthly operating report. Failure to file current accurate Monthly Operating Reports is cause for dismissal of a case. *See Roma Group, Inc. v. Office of the United States Trustee (In re Roma Group, Inc.)*, 165 B.R. 779, 780 (S.D.N.Y. 1994) (failure to file monthly operating reports "undermines the Chapter 11 process and constitutes cause for dismissal or conversion").

55.     Because the Debtor has not filed timely monthly operating reports on a regular basis, the Court, the United States Trustee, and the Debtor's creditors are unable to determine if there is a reasonable likelihood of rehabilitation. Without timely operating reports, the Court, the U.S. Trustee, and creditors cannot know whether the debtor is paying its obligations as they come due post-petition or whether the debtor is accruing administrative expenses, decreasing the possible recovery for unsecured creditors. Furthermore, the Court, the U.S. Trustee, and creditors cannot know whether the debtor is generating positive cash flow such that it will be able to fund a plan out of future earnings.

56.     "Timely and accurate financial disclosure is the life blood of the Chapter 11 process[.]" *In re Berryhill,* 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991). Because monthly operating reports are the means by which the creditors, the Court, and the United States

Trustee can monitor a debtor's post-petition operations, the failure to file timely monthly operating reports by itself constitutes sufficient cause to warrant conversion or dismissal of a chapter 11 case. *See Roma Group*, 165 B.R. at 780 (S.D.N.Y. 1994); *In re Bacon,* 52 B.R. 52, 53-54 (Bankr. N.D. Iowa 1985) (failure to file monthly operating reports is sufficient "cause to warrant dismissal of chapter 11 case because creditors are not being provided the basic financial data necessary to make decisions regarding their best interests[.]").

57.     Because the Debtor has failed to accept the basic responsibilities of a chapter 11 debtor-in-possession by not filing its most recent operating report, and failing in each instance to file its monthly operating reports on time, the Court, the U.S. Trustee, and the creditors have no basis by which to monitor the debtor's operations. Therefore, "cause" under 11 U.S.C. § 1112(b)(4)(F) is present.

### d.   Cause Exists as the Petition was Filed in Bad Faith.

58.     Lack of good faith in filing a Chapter 11 petition also establishes cause under 11 U.S.C. § 1112(b). *See Marsch v. Marsch (In re Marsch)*, 36 F.3d 825 (9th Cir. 1994). Even prospects for successful reorganization, which are not present here, do not override, as matter of law, a finding of bad faith. *See In re Motel Props., Inc.*, 314 B.R. 889 (S.D. Ga. 2004).

59.     Under circumstances similar to those here, a bankruptcy court properly found the "cause" required to warrant dismissal or conversion, where the evidence demonstrated that a Chapter 11 debtor filed his petition in bad faith to avoid an impending foreclosure. *See In re State Street Houses, Inc.*, 305 B.R. 738 (S.D. Fl. 2003). In *State Street*, the court also considered that the debtor had few unsecured creditors, whose claims were small in relation to the claims of its secured creditors. *Id*. Likewise, here, the Debtor filed his bankruptcy petition on the eve of the Third Foreclosure Proceeding to avoid that action. The fact that the Debtor, its owner RMS, and affiliates of the Debtor, had previously filed bankruptcy petitions on three prior occasions, each immediately

prior to Regions or another secured creditor foreclosing on its collateral is further evidence of the

Debtor's bad faith. Accordingly, the Bankruptcy Petition filed on the eve of foreclosure served as

nothing more than a litigation tactic in the dispute between the Regions and the Debtor. Like the

debtor in *State Street*, the unsecured creditors of the Debtor have claims, which pale in comparison

to those of the Debtor's secured creditors.

60.     In another bankruptcy case similar to our facts here, the court found that cause under

Section 1112(b) was present where (1) the debtor's sole assets were parcels of land subject

to foreclosure, (2) the filing was made in bad faith because the primary purpose of filing bankruptcy

was to frustrate impending foreclosures, and (3) the debtor had no income. *See In re Four J's Leasing*

*& Rentals, Inc.*, 68 B.R. 278 (M.D. Fla. 1986). Again, the facts here are very similar. The Debtor's

primary asset is the Real Property Collateral, and Regions has already foreclosed the Debtor's interest

in the Property. The Debtor filed its bankruptcy petition in bad faith for the primary purpose of

impeding Regions' foreclosure action, and the Debtor had no income at the time of filing.

61.     The Debtor here has never demonstrated the need, desire, or ability to utilize the

rehabilitative purposes of Chapter 11. It is clear that the Debtor's petition in this case, as in the cases

discussed above, was filed in bad faith, warranting conversion of this case to Chapter 7.

## II.    CONVERSION IS IN THE BEST INTERESTS OF THE CREDITORS AND THE ESTATE.

62.     Determining the best interests of the estate and the creditor involve separate, but

related inquiries. Conversion is in the best interests of the creditors where they would enjoy greater

rights in the bankruptcy forum than out. *See In re Citi-Toledo Partners*, 170 B.R. 602, 609 (Bankr.

N.D. Ohio 1994) ("[T]he fact that creditors will likely enjoy greater rights in bankruptcy court than

they would enjoy in state court militates in favor of conversion."). Conversion is in the best interest

of the estate where "the economic value of the estate is greater inside [rather than outside] of

bankruptcy." *In re Staff Investment Co*., 146 B.R. 256, 261 (Bankr. E.D. Cal. 1992). In this case,

conversion is appropriate because the appointment of a chapter 7 trustee would be in the best interests of both the estate and the creditors.

63.     Because a chapter 7 trustee is uniquely positioned and equipped to ensure that the Debtor's assets are all identified, recovered and administered, conversion is in the best interests of both the creditors and the estate. *See e.g. In re Stokes*, 2009 WL 3062314 at * 19 (Bankr. D. Mont. 2009) (finding that conversion is in the best interests of the creditors and the estate because, *inter alia*, a trustee will be appointed "to investigate and evaluate the [d]ebtor's assets and lawsuits.") The appointment of a chapter 7 trustee is especially appropriate in this matter considering the involvement of various related third party affiliates in this case and related proceedings.

64.     Along these same lines, a chapter 7 trustee may best assess whether there are any meritorious claims in the Debtor's estate, and may thereafter prosecute those with merit and abandon those without. *See e.g. In re Ameribuild Constr. Management, Inc.*, 399 B.R. 129, 133 (S.D.N.Y. 2009) (finding conversion appropriate because, *inter alia*, the case "requires the appointment of an independent fiduciary not only to undertake the collection of [assets of the estate in the form of receivables] but to examine the merits of the dispute between the Debtor and [a third party]."). This consideration marshals in favor of conversion, given the Debtor's failure to turnover the Insurance Proceeds to Regions. If this case is dismissed, Regions will be forced to initiate further litigation to receive what is rightfully its property, and which property the Debtor has no claim to. Against this consideration, conversion avoids further delays and fosters judicial economy, while at the same time moving the Debtor toward a final resolution.

65.     Conversion is also in the best interests of the creditors and the estate because tools are available in a chapter 7 case for the benefit of creditors that would be unavailable outside of bankruptcy, including the use of examinations under Fed. R. Bankr. P. 2004, and a trustee's

avoidance powers under chapter 5 of the Bankruptcy Code. This too weighs in favor of conversion. *See In re Citi–Toledo Partners,* 170 B.R. 602, 609 (Bankr.N.D.Ohio 1994) ("[T]he fact that creditors will likely enjoy greater rights in bankruptcy court than they would enjoy in state court militates in favor of conversion."). Finally, once administration of a chapter 7 case is completed, that will permit creditors to know that there likely are no further assets of the debtor worth pursuing.

### III.   CHAPTER 7 IS THE BEST MECHANISM TO WIND UP THE DEBTOR'S AFFAIRS.

66.    Chapter 7 is an appropriate forum to liquidate a debtor with no continuing revenue generating activity. *In re Staff. Inv. Co.*, 146 B.R. 256, 261 (Bankr. E. D. Cal. 1993). Indeed "it provides a statutory means for an orderly liquidation and equitable distribution of the debtors' assets." *In re the Great American Pyramid Joint Venture*, 144 B.R. 780, 793 (Bankr. W.D. Tenn. 1992). The Debtor's principal asset is its logging and trucking business, which are completely dependent on the Real Property Collateral. Regions has foreclosed the Debtor's interest in the Real Property Collateral, and sold the same to LMIW VII, LLC. Accordingly, Chapter 7 is an appropriate forum to assess the Debtor's remaining assets and liquidate and dispose of such assets to its creditors. As evidenced in the Title Commitment, attached as **Exhibit 4-A** to **Exhibit 1-A**, and by the claims filed in the Claims Register, the Debtor has over a dozen creditors or judgment creditors with liquidated judgments, lawsuits in progress, or liens recorded against the Debtor's assets. Conversion of the bankruptcy case would allow the Court to fully resolve pending litigation, and utilize the claims process to provide a final outcome for the Debtor's creditors. *See In re the Great Am. Pyramid Joint Venture,* 144 B.R. 780, 793 (Bankr. W.D. Tenn. 1992) (noting that a chapter 7 case "provides a statutory means for an orderly liquidation and equitable distribution of the debtors' assets.").

## CONCLUSION

Based on the foregoing, the Court should grant the Motion and enter an order converting this case to a case under Chapter 7 of the Bankruptcy Code, and such further and other relief as the Court deems necessary and proper.

Dated: March 25, 2020

<div style="margin-left:40%">

Respectfully submitted,

/s/ George H. Barber
George H. Barber
State Bar No. 01705650
Email: gbarber@johnstonpratt.com
Johnston Pratt PLLC
1717 Main Street, Suite 3000
Dallas, Texas 75201
214-974-8000 – Telephone
214-474-1750 – Facsimile

Joe A. Joseph (Admitted Pro Hac Vice)
Of Counsel
Alabama State Bar No. ASB-2964-J50J
Email: jjoseph@burr.com
Burr & Forman LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama 35203
205-251-3000 – Telephone
205-458-5100 – Facsimile

ATTORNEYS FOR REGIONS BANK

</div>

## <u>CERTIFICATE OF SERVICE</u>

       This is to certify that on March 25, 2020, a true and correct copy of the foregoing pleading with exhibits was served, (1) by ECF service on all entities receiving ECF service, (2) by email to counsel for the debtors and the Office of the United States Trustee at the email address stated below, and (3) by first class U.S. Mail, postage prepaid on all other entities listed on the attached service list.

<div align="right">/s/ George H. Barber_____<br>George H. Barber</div>

Joyce W. Lindauer on behalf of Debtor Pro South, Inc.
joyce@joycelindauer.com
dian@joycelindauer.com; gina@joycelindauer.com; ecfnotices@joycelindauer.com

US Trustee
USTPRegion06.TY.ECF@USDOJ.GOV

Label Matrix for local noticing
0540-4
Case 19-42427
Eastern District of Texas
Sherman
Wed Mar 25 08:30:17 CDT 2020

Amy (Siesen Stint)
619 Highway 30 East
Booneville, MS 38829-8012

Attorney General of Texas
Bankruptcy Division
PO Box 12548
Austin, TX 78711-2548

George H. Barber
Johnston Clem Gifford PLLC
1717 Main Street
Suite 3000
Dallas, TX 75201-4335

BlueBridge Financial, LLC
535 Washington Street
Suite 201
Buffalo, NY 14203-1430

Bureau Veritas Certification
North America, Inc.
PO Box 405661
Atlanta, GA 30384-5661

Camso USA, Inc.
PO Box 60158
Charlotte, NC 28260-0158

Capital Merchant Services
One Evertrust Plaza
Suite 1401
Jersey City, NJ 07302-3087

Cash Capital Group, LLC
The Rubin Law Firm, PLLC
Attn: Ashlee Cohen
90 Broad Street, 16th Floor
New York, NY 10004-2345

Caterpillar Financial Services
PO Box 340001
Nashville, TX 37203-0001

Celtic Commercial Finance
4 Park Plaza
Suite 300
Irvine, CA 92614-8511

Commercial Credit Group, Inc.
c/o Adams and Reese, LLP
Attn: John Thomson
3424 Peachtree Road NE, Suite 1600
Atlanta, GA 30326-1139

(p)TEXAS COMPTROLLER OF PUBLIC ACCOUNTS
REVENUE ACCOUNTING DIV - BANKRUPTCY SECTION
PO BOX 13528
AUSTIN TX 78711-3528

Corporate Billing
PO Box 1726
Decatur, AL 35602-1726

Dees Oil
PO Box 98
Ripley, MS 38663-0098

Dragon Woodland Corporation
3624 E. Shelby Drive
Memphis, TN 38118

Enhanced Capital Mississippi Fund
c/o James A. McCullough
PO Drawer 119
Jackson, MS 39205-0119

Ferrell's Home & Outdoor
807 S. Parkway St.
Corinth, MS 38834-6564

Financial Pacific Leasing
3455 S. 344th Way
Suite 300
Auburn, WA 98001-9546

Financial Pacific Leasing
3455 S. 344th Way
Suite 300
Federal Way, WA 98001-9546

(p)FUNDBOX  INC
300 MONTGOMERY ST
SUITE 900
SAN FRANCISCO CA 94104-1921

GCR Tire & Service
2625 Highway 20
Tuscumbia, AL 35674-6003

H & E Equipment Services
5245 Highway 78
Memphis, TN 38118-7807

H & E Equipment Services
PO Box 849850
Dallas, TX 75284-9850

Hitachi Capital America Corp.
c/o Kye Law Group, P.C.
201 Old Country Road
Suite 120
Melville, NY 11747-2725

Hitachi Capital American Corp.
21925 Network Place
Chicago, IL 60673-1219

Internal Revenue Service
Centralized Insolvency
PO Box 7346
Philadelphia, PA  19101-7346

Internal Revenue Service
Mail Code DAL-5020
1100 Commerce Street
Dallas, Texas 75242-1100

John Deere Power Plans
PO Box 5328
Madison, WI 53705-0328

Kenneth Craig Johnston
Johnston Clem Gifford PLLC
1717 Main Street
Suite 3000
Dallas, TX 75201-4335

Joe A. Joseph
Burr & Forman LLP
420 N. 20th St., Ste. 3400
Birmingham, AL 35203-3284

Justin Hayden
Smythe, Huff & Hayden, PC
144 Second Avenue North
The Pilcher Bldg., Suite 333
Nashville, TN 37201-1935

Kapitus Servicing, Inc.
120 West 45th Street, 4th Floor
New York, NY 10036-4041

Lancaster Pipeline & Construction
864 Jim Hayes Lane
Scotts Hill, TN 38374-6644

Joyce W. Lindauer
Joyce Lindauer, Attorney
1412 Main Street
Suite 500
Dallas, TX 75202-4042

Linebarger Goggan Blair & Sampson
2777 N. Stemmons Freeway
Suite 1000
Dallas, TX 75207-2328

Martyville Quick Mart
1379 Highway 25
Tishomingo, MS 38873-9671

Money Works Direct, Inc.
c/o Timothy A. Hennigan
PO Box 1958
Ashland, VA 23005-4958

Money Works Direct, Inc.
Attn: Timothy A. Hennigan
PO Box 1958
Ashland, VA 23005-4958

Napa Auto Parts
1105 South Gloster
Tupelo, MS 38801-6533

Timothy W. O'Neal
Office of the U.S. Trustee
110 N. College Ave.
Suite 300
Tyler, TX 75702-7231

Oakman Hardwood, Inc.
PO Box 230
Oakman, AL 35579-0230

Office of the Attorney General
Internal Revenue Service
900 Jefferson Avenue
Oxford, MS 38655-3608

Panther Petroleum, LLC
2570 Van Hook Avenue
Hamilton, OH 45015-1582

Panther Petroleum, LLC
386 Airways Blvd.
Jackson, TN 38301

Pioneer Machinery and Supply, Inc.
PO Box 959
Corinth, MS 38835-0959

PowerPlan
PO Box 5328
Madison, WI 53705-0328

Prentiss County Tax Collector
PO Box 283
Booneville, MS 38829-0283

Pro Mac Manufacturing, Ltd.
2940 Jacob Road
Duncan, BC V9L 6W4

Pro South, Inc.
11450 US Highway 80
Suite 130, #141
Crossroads, TX 76227

RLHI
30 CR 1461
Burnsville, MS 38833-9523

Regions Bank
c/o Johnson Pratt PLLC
1717 Main Street
Suite 3000
Dallas, TX 75201-4335

Regions Bank
Attn: Donald M. Warren
Burr & Foreman LLP
420 N. 20th Street, Suite 3400
Birmingham, AL 35203-3284

Regions Bank
Attn: Joe A. Joseph
Burr & Foreman LLP
420 N. 20th Street, Suite 3400
Birmingtham, AL 35203-3284

Regions Bank
Attn: John M. Lassiter
Burr & Foreman LLP
401 East Capitol Street, Suite 100
Jackson, MS 39201-2608

Regions Bank
Attn: Regan C. Loper
Burr & Foreman LLP
420 N. 20th Street, Suite 3400
Birmingham, AL 35203-3284

Robert Byrd
Byrd & Wiser
PO Box 1936
Biloxi, MS 39533-1936

Rolison Timber Company, Inc.
391 CR 516
Ripley, MS 38663-8618

Southern Electrical Services
PO Box 3086
Tupelo, MS 38803-3086

Summit Truck Group
PO Box 529
Tupelo, MS 38802-0529

TCF Equipment Finance
11100 Wayzata Blvd.
Suite 801
Hopkins, MN 55305-5503

Texas Workforce Commission
101 East 15th Street
Austin, TX 78778-0001

Thompson Machinery
1245 Bridgestone Blvd.
La Vergne, TN 37086-3510

U. S. Attorney
110 N. College Ave.
Suite 700
Tyler, TX 75702-0204

U. S. Trustee's Office
110 N. College Street
Suite 300
Tyler, TX 75702-7231

U.S. Attorney General
Department of Justice
Main Justice Building
10th & Constitution Ave., NW
Washington, DC 20530-0001

US Trustee
Office of the U.S. Trustee
110 N. College Ave.
Suite 300
Tyler, TX 75702-7231

Unifirst
PO Box 303
Booneville, MS 38829-0303

Wells Fargo Equipment Finance
PO Box 7777
San Francisco, CA   94120-7777

Wells Fargo Equipment Finance
Manufacturer Services Group
PO Box 7777
San Francisco, CA 94120-7777

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Comptroller of Public Accts
Rev Acctg Div/Bankruptcy Dept
PO BOX 13528
Austin, TX 78711

Fundbox
300 Montgomery St., Suite 900
San Francisco, CA 94104

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(d)Capital Merchant Services
One Evertrust Plaza
Suite 1401
Jersey City, NJ 07302-3087

(u)Cash Capital Group, LLC
c/o The Rubin Law Firm, PLLC

(d)Celtic Commercial Finance
4 Park Plaza, Suite 300
Irvine, CA 92614-8511

(u)Commercial Credit Group, Inc.

(d)Corporate Billing
PO Box 1726
Decatur, AL 35602-1726

(d)Enhanced Capital Mississippi Fund, LLC
c/o James A. McCullough
PO Drawer 119
Jackson, MS 39205-0119

(u)Grits Capital

(d)H&E Equipment Services
5245 Highway 78
Memphis, TN 38118-7807

(d)Hitachi Capital America Corp.
c/o Kye Law Group, P.C.
201 Old Country Road, Suite 120
Melville, NY 11747-2725

(d)Hitachi Capital American Corp.
21925 Network Place
Chicago, IL 60673-1219

(d)John Deere Power Plan
PO Box 5328
Madison, WI 53705-0328

(d)Oakman Hardwood, Inc.
PO Box 230
Oakman, AL 35579-0230

(d)Pioneer Machinery and Supply, Inc.
PO Box 959
Corinth, MS 38835-0959

(d)Prentiss County Tax Collector
PO Box 283
Booneville, MS 38829-0283

(d)RLHI
30 CR 1461
Burnsville, MS 38833-9523

(d)Rolison Timber Company, Inc.
391 CR 516
Ripley, MS 38663-8618

(d)Southern Electrical Services
PO Box 3086
Tupelo, MS 38803-3086

(u)Yellowstone

(du)Yellowstone

End of Label Matrix
Mailable recipients      69
Bypassed recipients      19
Total                    88